IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DIRECT CHECK, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB 10-050 |
| HSBC TECHNOLOGY & SERVICES (USA) INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Defendant, HSBC Technology & Services (USA) Inc. ("HSBC") moves to dismiss Plaintiff Direct Check, Inc.'s ("Direct Check") one-count complaint alleging that HSBC breached its contract with Direct Check when it stopped purchasing all of its check stock exclusively from Direct Check. Plaintiffs bring suit in this Court based on diversity of citizenship. *See* 28 U.S.C. § 1332. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons that follow, Defendant HSBC's Motion to Dismiss (ECF No. 14) is DENIED.

### BACKGROUND

In ruling on a motion to dismiss, "[t]he factual allegations in the plaintiff's complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

Direct Check, which has its principal place of business in Maryland, is a corporation that develops and sells software that assists businesses with debt collection. Compl. ¶ 2, 3. HSBC, which has its principal place of business in Minnesota, delivers and supports IT solutions and services on behalf of HSBC USA Inc., one of the nation's largest bank holding companies. *Id*. ¶

1

4. HSBC USA Inc. operates more than 460 bank branches throughout the United States, including one location in Hanover, Maryland.

On October 13, 1993, Direct Check and HSBC, via an affiliated entity, entered into a licensing agreement (the "Agreement") concerning Direct Check's check-writing software applications. Compl. ¶ 5, Ex. A. Under the Agreement, HSBC paid an initial license fee and a monthly maintenance fee to Direct Check to use its check-writing software. *Id*. ¶ 3, Ex. A. This software allows Direct Check's licensees to use bank account information and verbal authorization obtained from debtors over the telephone to print a check that could then be deposited directly into a client's bank account. *Id*. ¶ 3.

Direct Check and HSBC amended the Agreement six times between October 1993 and April 2006. *Id*. ¶ 5; Opp'n Exs. 1-A to 1-F. Direct Check contends that certain language in the amendments plainly requires HSBC to purchase from Direct Check all the paper "check stock" HSBC needed to print the checks generated by Direct Check's software. Specifically, Direct Check emphasizes language in three amendments from 1996 and 1999 stating that: "Customer shall purchase check stock from Licensor at the following quantity prices. Quantity prices are $79.00 for 2,000 checks or $300.00 for 10,000 checks." Opp'n Exs. 1-C to 1-E. These amendments also explain that HSBC would pay Direct Check a monthly maintenance fee of $60 for its use of Direct Check's software. *Id*. The latest amendment is dated April 1, 2006. Compl. Ex. D. Unlike the previous amendments, the 2006 amendment does not state that HSBC was required to pay a monthly maintenance fee for Direct Check's software and support services. *Id*. Ex. D. The 2006 amendment also reduced the price of the check stock HSBC bought from Direct Check, stating that: "Customer shall purchase check stock from Licensor at the price of $225.00 for 10,000 checks." *Id*. Ex. D. Notably, the 2006 amendment adds a provision that

2

"Customer agrees to purchase check paper from Licensor for its locations at: [Hanover, MD, Schaumburg, IL, and Pomona, CA]." *Id*.

Direct Check contends that the parties' conduct and course of dealing over the last fifteen years shows that both parties understood that HSBC was required to purchase all of its check stock exclusively from Direct Check. Direct Check claims that HSBC purchased all of its check stock from Direct Check from the time they signed the Agreement in October 1993 until October 2008. Compl. ¶ 6. Direct Check asserts that on or about January 2004, it stopped charging HSBC a monthly maintenance fee for the software license and support services because Direct Check accepted the sale of the check stock as sole consideration for HSBC's continued use of the software and support services. Compl. ¶ 6. Nonetheless, in January 2008, HSBC stopped purchasing check stock from Direct Check for its Hanover, Maryland location. *Id*. ¶ 7. In January 2009, HSBC stopped buying check stock from Direct Check entirely. *Id*. Since that time, Direct Check has not received any money from HSBC, though it continues to use Direct Check's software. *Id*. Thus, Direct Check alleges that HSBC breached the Agreement when it purchased check stock for use with Direct Check's software from other sources. *Id*. ¶ 11.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted; therefore, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a

"formulaic recitation of the elements of a cause of action." *Id.* at 555. Thus, a court considering a motion to dismiss "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Well-pleaded factual allegations contained in the complaint are assumed to be true "even if [they are] doubtful in fact," but legal conclusions are not entitled to judicial deference. *See Twombly*, 550 U.S. at 570 (stating that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'" (citations omitted)). Thus, even though Rule 8(a)(2) "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

To survive a Rule 12(b)(6) motion, the legal framework of the complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Supreme Court has explained recently that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 129 S. Ct. at 1949. The plausibility standard requires that the pleader show more than a sheer possibility of success, although it does not impose a "probability requirement." *Twombly*, 550 U.S. at 556. Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1937. Thus, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Id.*

## ANALYSIS

HSBC asserts that Direct Check's breach of contract claim is barred by Maryland's Statute of Frauds because neither the Agreement nor its amendments contain a specific quantity

term for HSBC's alleged obligation to purchase check stock.  Because jurisdiction is based on diversity of citizenship, this Court applies Maryland law in deciding this motion. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State."); *Limbach Co., LLC v. Zurich Am. Ins. Co.*, 396 F.3d 358, 361 (4th Cir. 2005) ("The district court must apply the law of the forum state, including its choice of law rules.").  There is no dispute that the Maryland Uniform Commercial Code, Md. Code Ann., Com. Law § 2-101 *et seq.* (the "U.C.C.") governs the Agreement, as the U.C.C. applies to "transactions in goods."  Md. Code Ann., Com. Law § 2-102.  There is also no dispute that the Statute of Frauds applies to the Agreement, as the Statute of Frauds applies to contracts for the sale of goods for $500 or more, and Direct Check claims lost check stock sales of $35,000 per month.  *Id.* § 2-201; Compl. ¶ 12.

Under the Statute of Frauds, a contract for the sale of goods for $500 or more must be made in writing, and is not enforceable "beyond the quantity of goods shown in writing."  Md. Code Ann., Com. Law § 2-201(1).  Maryland courts have construed this language to "requir[e] a quantity term in order for an agreement to be enforceable."  *Lohman v. Wagner*, 862 A.2d 1042, 1048 (Md. App. 2004); *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 377 (Md. App. 1983).  The U.C.C. does not require that a quantity term must be stated in a specific number of goods, however.  Md. Code § 2-306.  Instead, the quantity can also be measured in terms of the seller's output or the buyer's requirements.  *Id.*  Nonetheless, "even where the quantity term is not numerically stated, there must be some writing which indicates that the quantity to be delivered under the contract is a party's requirements."  *Cavalier*, 454 A.2d at 377.

HSBC argues that Direct Check's breach of contract claim is barred by the Statute of Frauds because the Agreement "does not require HSBC to buy any check stock, let alone all of its check stock, from [Direct Check]."  Mot. Dismiss Mem. at 4 (emphasis in original).  In

5

response, Direct Check argues that the language in the amendments stating that "Customer agrees to purchase check paper from Licensor for its locations at [Hanover, MD, Schaumburg, IL, and Pomona, CA]," and that HSBC "shall purchase" check stock from Direct Check at certain rates, establishes that HSBC was obligated under the agreement to buy all of its check stock exclusively from Direct Check.

First, this Court will address whether the Agreement requires HSBC to buy any check stock from Direct Check. Direct check relies upon the U.S. Court of Appeals for the Seventh Circuit's reasoning in *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 817 (7th Cir. 1999). In *Zemco*, the Seventh Circuit reversed the district court's granting of summary judgment in favor of the defendant on a breach of contract claim. The Seventh Circuit held that the parties' contract as a whole—especially the language requiring Navistar to purchase "such quantities of the items listed herein as [it] might order or schedule," and a clause requiring Zemco to give priority to Navistar's orders—was unclear and therefore further investigation as to whether the parties intended to enter into a requirements contract was necessary. *Zemco*, 186 F.3d at 817. The Seventh Circuit then looked to the parties' course of dealing over twelve years, ultimately determining that there was a genuine issue of fact with respect to the parties' intent that could not be resolved at the summary judgment stage. *Id.* at 818.

In this case, the language in the 2006 amendment stating that "Customer agrees to purchase check paper from Licensor for its locations at [Hanover, MD, Schaumburg, IL, and Pomona, CA]," taken in conjunction with the language, "Customer shall purchase check stock from Licensor at the price of $225.00 for 10,000 checks," is ambiguous. This language expressly indicates that HSBC entered into an understanding that it would purchase, at a minimum, *some* check stock for three of HSBC's offices at a certain price. As the Seventh Circuit held in *Zemco*, though this language standing alone may not establish the existence of a

6

requirements contract, "we cannot say that it establishes, as a matter of law, that the contract is not such a contract." *Zemco*, 186 F.3d at 817.

Second, this Court will consider HSBC's contention that this Court may not look to parol evidence to determine the parties' intent because the Agreement and subsequent amendments do not contain a quantity term. As the U.S. Court of Appeals for the Fourth Circuit has explained, "The general rule is that when quantity is not precisely stated, parol evidence is admissible to show what the parties intended as the exact quantity . . . but where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term." *Thomas J. Kline, Inc. v. Lorillard, Inc*., 878 F.2d 791, 794 (4th Cir. 1989) (internal quotation and citation omitted). In this case, though, the contract of sale is not "totally silent" as to quantity. Instead, the language clearly requires HSBC to purchase *some* amount of check stock from Direct Check for three of its offices. Thus, the Agreement does not precisely state the quantity of check stock HSBC was obligated to purchase, this is the exact situation in which the Fourth Circuit has held parol evidence is admissible to show the parties' intent. Because parol evidence is necessary to determine whether the parties' intended to enter into a requirements contract, this Court cannot determine at this stage whether Direct Check's breach of contract claim is barred by the Statute of Frauds. Accordingly, HSBC's motion to dismiss must be denied.

## CONCLUSION

For the reasons stated above, Defendant HSBC's Motion to Dismiss (ECF No. 14) is DENIED.

A separate Order follows.

Dated: December 7, 2010  /s/_____
 Richard D. Bennett
 United States District Judge

7